## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PATRICK CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  1:24-cv-13128 |
| v. | ) | |
| | ) | |
| CEDRIC FRANCOIS, PAUL FONTEYNE, | ) | JURY TRIAL DEMANDED |
| STEPHANIE MONAGHAN O'BRIEN, A. | ) | |
| SINCLAIR DUNLOP, ALEC MACHIELS, | ) | |
| and GERALD CHAN, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| APELLIS PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Patrick Campbell ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Apellis Pharmaceuticals, Inc. ("Apellis" or the "Company"), against members of its Board of Directors (the "Board") (the "Individual Defendants[1]") to remedy their breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, filings in related actions, the Company's publicly available documents, conference call transcripts and announcements made by the Individual Defendants and the Company ("collectively,

---

[1] The Individual Defendants are Cedric Francois, Paul Fonteyne, Stephanie Monaghan O'Brien, A. Sinclair Dunlop, Alec Machiels, and Gerald Chan.

"Defendants"), United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Apellis, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Apellis against members of its board of directors (the "Board") seeking to remedy Defendants' violations of law that have occurred from January 28, 2021 and July 28, 2023 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Apellis and its shareholders including monetary losses and damages to Apellis's reputation and goodwill.

2.      Apellis is a commercial-stage biopharmaceutical company that focuses on the discovery, development, and commercialization of therapeutic compounds through the inhibition of the complement system for autoimmune and inflammatory diseases.

3.      As detailed below, this complaint arises from the Individual Defendants, as representatives of Apellis, making or permitting the issuance of false and misleading statements and failure to disclose to investors relevant facts concerning its products and business.

4.      Apellis' "lead product candidate", now marketed as SYFOVRE, is an intravitreal pegcetacoplan injection for treating geographic atrophy due to age-related macular degeneration (AMD). At the beginning of the Relevant Period, Apellis was conducting two phase 3 studies-OAKS and DERBY-on pegcetacoplan for geographic atrophy. CEO Cedric Francois described the results of these studies as "a seminal event for our company."

5.      Even with potential FDA approval, the patient risk/benefit assessment was especially significant for investors, as pegcetacoplan had not shown an ability to improve eyesight in AMD patients. Instead, the data indicated only a possible benefit in slowing the progression of

vision loss caused by the disease. Prior to receiving the results of the studies, Defendant Francois had stated in October 2020 that a "clinically meaningful" reduction in growth of geographic atrophy for purposes of commercialization would be a "20% to 30%" reduction over the course of one year. The study results ultimately demonstrated only a reduction in disease progression of 16% to 22% over one year. As noted by a Credit Suisse analyst in a report dated September 9, 2021, "The pooled analysis suggests a potential benefit that is at the low end of what physicians we spoke to highlighted as meaningful."

6.      In contrast, other intravitreal treatments-administered via eye injection-had been associated with inflammation and severe side effects, including potential vision loss. Recently, some FDA-approved intravitreal treatments lost popularity among doctors and patients due to links to retinal vasculitis, a condition causing inflammation in the retina that can lead to substantial vision loss. Consequently, investors worried that if SYFOVRE posed serious risks, its target demographic-the elderly-might avoid these injections, opting out of the modest benefit of slowing geographic atrophy progression, thereby restricting Apellis's potential financial gains. As a Cantor Fitzgerald analyst explained in a September 9, 2021 report: "If approved, key factor will be how the physician community accepts the drug's profile."

7.      Amid these concerns, investors were pleased when Apellis started releasing interim and final results for the OAKS and DERBY studies. Although inflammation and ischemic optic neuropathy rates (potential indicators of retinal vasculitis) were comparable to those in other intravitreal treatments that had lost favor due to retinal vasculitis risks, Defendants repeatedly reassured the market that there "were no cases of vasculitis or occlusive vasculitis" in the OAKS and DERBY trials.

8.      Defendant's assurances, however, were unfounded. The fluorescein angiogram-using fluorescent dye and a specialized camera-is the standard method for detecting retinal vasculitis through vascular leakage and macular edema. Despite knowing that adverse event risks, especially retinal vasculitis, were critical concerns for investors and physicians, Apellis did not implement a clear protocol in the OAKS or DERBY studies for angiography to detect retinal vasculitis in cases of intraocular inflammation or ischemic neuropathy. Instead, angiography was only performed at the study's end or after a participant's dropout, with a minimum 30-day delay, reducing the sensitivity for detecting issues that might have subsided over time. Thus, Apellis's claims of "no cases of vasculitis" were misleading, as the studies were not structured to identify such cases accurately.

9.      This failure was particularly concerning because the dropout rate in the treatment arm was significantly higher than in the "sham" arm (where patients did not receive pegcetacoplan). This discrepancy signaled to Defendants that patients might have been leaving due to adverse events like inflammation, neuropathy, or possibly retinal vasculitis. However, the Company lacked the ability to monitor these dropouts for vasculitis-assuming Apellis had an adequate angiography protocol in place to detect it.

10.      After years of Defendants consistently asserting that no cases of vasculitis were observed among study participants, the true risks associated with SYFOVRE became apparent to investors on July 15, 2023. The American Society of Retina Specialists (ASRS) issued a letter that day, revealing serious concerns with SYFOVRE, including reports from physicians of six cases of occlusive retinal vasculitis-a form of inflammation that obstructs blood flow to the retina, potentially leading to blindness.

11.     Following this news, Apellis's stock price dropped sharply by $32.04 per share, or almost 38%, plummeting from $84.50 at the close on Friday, July 14, 2023, to $52.46 at the close on Monday, July 17, 2023.

12.     After the market closed on July 17, 2023, Apellis released a statement in response to ASRS's concerns about vasculitis linked to SYFOVRE. The company clarified that among the six reported vasculitis cases following SYFOVRE treatment, "two of the events were confirmed as occlusive, one was confirmed as non-occlusive, and the remaining three were undetermined based on limited information and lack of imaging."

13.     Following this announcement, Apellis's stock price fell an additional $12.46 per share, or 23.75%, closing at $40.00 on July 18, 2023.

14.     Before the market opened on July 20, 2023, Wedbush downgraded Apellis's price target by over 50%, lowering it from $86.00 to $40.00 per share.

15.     In response to this news, Apellis's stock price dropped $6.25 per share, or about 15%, falling from $40.49 at the close on July 19, 2023, to $34.24 at the close on July 20, 2023.

16.     On July 29, 2023, Apellis issued an update on its review of the six retinal vasculitis cases associated with SYFOVRE reported by the ASRS. In this update, Apellis confirmed a seventh case of retinal vasculitis linked to SYFOVRE, as verified by its internal safety committee and external retina/uveitis specialists. The Company also disclosed that it was assessing an eighth reported case of retinal vasculitis, which had not yet been confirmed.

17.     Following this news, Apellis's stock price fell by $6.27 per share, or about 19.6%, dropping from $32.02 at the close on July 28, 2023, to $25.75 at the close on July 31, 2023.

18.     During the Relevant Period, the Individual Defendants made or permitted the issuance of materially false and misleading statements that, *inter alia*, failed to disclose that: (i)

inflammation and neuropathy rates in the OAKS and DERBY trials were comparable to other intravitreal treatments associated with retinal vasculitis, (ii) SYFOVRE's intravitreal injections inherently risked retinal vasculitis, (iii) there had been recent, notable cases of intravitreal injections leading to retinal vasculitis, and (iv) treatment groups showed much higher dropout rates than the sham group, suggesting potential side effects like retinal vasculitis could have caused participants to exit the trial. Additionally, though Defendants recognized angiography as the correct method to detect retinal vasculitis, they did not establish a protocol to promptly obtain angiography in instances of intraocular inflammation or ischemic optic neuropathy.

19.    As a result of the foregoing, a securities fraud class action was filed against the Company and Individual Defendant Cedric Francois, captioned *in re Apellis Pharmaceuticals, Inc. Securities Litigation*, Case No. 1:24-cv-11470-JEK (D. Mass.) (the "Securities Class Action").

20.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial harm, including the costs of defending against and potential class-wide liability in the related Securities Class Action, as well as additional damages, including reputational harm and loss of goodwill.

21.    Plaintiff did not make a demand on the Board to bring this action against the Individual Defendants because such a demand is futile. As detailed further herein, a pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and SEC Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

26.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

***Plaintiff***

28.     Plaintiff is, and has been at all relevant times, a shareholder of Apellis common stock.

***Nominal Defendant***

29.     Nominal Defendant Apellis is incorporated under the laws of Delaware, with its

principal executive offices located at 100 Fifth Avenue, Waltham, MA, 02451. Apellis common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "APLS."

***Individual Defendants***

30.     Defendant Cedric Francois ("Francois") is the co-founder of Apellis and has served as a member of the Board and as President and Chief Executive Officer since its inception in 2009. Additionally, Francois is named as a defendant in the Securities Class Action.

31.     The Apellis website states the following about Defendant Francois:

Cedric is a co-founder of our company and has served as a member of our board of directors and as our President and Chief Executive Officer since September 2009. Prior to co-founding our company, Cedric co-founded Potentia Pharmaceuticals, a private biotechnology company, which transacted with Alcon Research Ltd in 2009. Cedric received his MD degree from the University of Leuven in Belgium and his PhD degree in physiology from the University of Louisville. Following postgraduate training in pediatric and transplant surgery, Cedric joined the research team that performed the first successful hand transplantation in Louisville in 1999.

32.     During the Relevant Period, Defendant Francois made the following sales of stock:

| Trade Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/16/2023 | 30,000 | $85.66 | $2,569,900 |
| 4/18/2023 | 30,000 | $82.02 | $2,460,720 |
| 3/21/2023 | 30,000 | $62.74 | $1,882,332 |
| 12/19/2022 | 28,200 | $52.06 | $1,467,983 |
| **Total Shares Sold** | 118,200 | **Total Proceeds** | $8,380,935 |

33.     Defendant Paul Fonteyne ("Fonteyne") has served as a member of the board since 2020. Fonteyne is also a member of the Audit Committee

34.     The Apellis website states the following about Defendant Fonteyne:

Paul has more than 30 years of experience in the biopharmaceutical industry, including 15 years of leadership roles in the United States and globally with Boehringer-Ingelheim. He was named President and CEO of Boehringer-Ingelheim USA in November 2011 and subsequently served as its Chairman until he retired in January 2019. Paul also held commercial leadership roles at Merck and Co. Inc. for nine years and at Abbott Laboratories for eight years.

Paul is on the board of several clinical and commercial stage biotechnology companies, including Gelesis, DalCor, Amylys, and Ypsomed AG, a medical device company, as well as Covetrus, an animal health company. He also serves as an Executive in Residence to Canaan Partners, a Venture Capital Fund dedicated to Health Care and Technology early-stage venture investing Paul has served on the board of PhRMA and chaired the National Pharmaceutical Council. He holds a M.S in Chemical Engineering from the University of Brussels and an MBA from Carnegie Mellon University.

35.     According to the Company's 2024 Proxy Statement, Defendant Fonteyne received

$504,084 in Director Compensation for the fiscal year ended December 31, 2023.

36.     Defendant Stephanie Monaghan O'Brien ("O'Brien") has served as a member of

the board since 2013.

37.     The Apellis website states the following about Defendant O'Brien:

Stephanie represents Morningside Ventures and has extensive experience in working with venture-backed companies focused on novel science. She focuses on early-stage companies, working with CEOs on building the management team and developing business plans She has served on numerous private company boards, including Aduro Biotech, ViOptix, Inc., I-Behavior, Inc., Natural Polymer International Corp., Serica Technologies, Inc., and BiddingForGood, Inc. She received her AB degree, cum laude, from Harvard College and her JD degree from New York University School of Law. Prior to attending law School Stephanie worked for Chase Manhattan Bank, NA, where she completed the loan officer credit training program and then worked in international portfolio analysis After law school, Stephanie spent nine years as a corporate lawyer with Hale and Dorr in the Boston and Washington, DC offices, working primarily with venture capital finance and startup companies.

38.     According to the Company's 2024 Proxy Statement, Defendant O'Brien received

$488,459 in Director Compensation for the fiscal year ended December 31, 2023.

39.     Defendant Sinclair Dunlop ("Dunlop") has served as a member of the board since

2010. Dunlap is also a member of the Audit Committee.

40.     The Apellis website states the following about Defendant Dunlop:

As Managing Partner of Epidarex, Sinclair leads the review and analysis of Epidarex's investment candidates A former international business and

economics analyst with the Center for Strategic and International Studies in Washington DC, Sinclair has private equity and venture capital experience in Europe, the US, and Israel. Prior to founding Epidarex, Sinclair acted as the Director of New Business Ventures of MASA Life Science Ventures after a period as an Associate at New Vantage Group, manager of several early-stage venture capital funds in the Mid-Atlantic region. In May 2000, Sinclair received his MBA degree from Columbia Business School where he was the R. C. Kopf British-American Fellow in international business .He also holds an MA degree with honors in political economy from the University of Glasgow and an MA degree in International Relations from the Maxwell School of Citizenship and Public Affairs at Syracuse University. He is a Saint Andrews Society of the State of New York Scholar.

41.    According to the Company's 2024 Proxy Statement, Defendant Dunlop received

$480,959 in Director Compensation for the fiscal year ended December 31, 2023.

42.    During the Relevant Period, Defendant Dunlop made the following sales of stock:

| Trade Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/3/2023 | 500 | $74.05 | $37,025.00 |
| 3/1/2023 | 500 | $65.33 | $32,665.00 |
| 2/1/2023 | 500 | $52.61 | $26,305.00 |
| 1/3/2023 | 500 | $50.70 | $25,350.00 |
| 12/1/2022 | 500 | $49.93 | $24,965.00 |
| 11/1/2022 | 500 | $60.83 | $30,415.00 |
| 9/8/2022 | 15,000 | $65.00 | $975,000.00 |
| 8/11/2022 | 30,000 | $65.63 | $1,968,900.00 |
| 6/27/2022 | 1,341 | $46.79 | $62,743.00 |
| 6/23/2022 | 15,000 | $45.00 | $67,500.00 |
| 5/18/2021 | 162,873 | $52.54 | $8,558,129.00 |
| Total Shares Sold | 227,214 | Total Proceeds | $11,808,997.00 |

43.    Defendant Alec Machiels has served as a member of the board since 2009. Machiels

is also the Chair of the Audit Committee.

44.    The Apellis website states the following about Defendant Machiels:

Alec is the Founder and Managing Partner of CoLift, a new private equity platform bringing together a global network of leaders with bespoke investment opportunities. He was a Partner at Pegasus Capital Advisors, L.P., a private equity fund manager with approximately $2bn in assets under

management. Alec was a member of the firm's executive and investment committees. He has over 20 years of private equity investing and investment banking experience. Previously, Alec was a financial analyst in the Financial Services Group at Goldman Sachs International in London and in the Private Equity Group at Goldman Sachs & Co. in New York. Investments in which he has been highly involved include Pure Biofuel, Molycorp Minerals, Traxys, Slipstream Communications, Coffeyville Resources, and Merisant Company. He also co-founded and serves as a board member of Potentia Pharmaceuticals, Inc. and Apellis Pharmaceuticals, Inc. He also served as a member of the board of trustees of the American Federation of Arts, where he chaired the endowment committee. Alec is a graduate of Harvard Business School, KU Leuven Law School in Belgium, and Konstanz University in Germany.

45.    According to the Company's 2024 Proxy Statement, Defendant Machiels received

$495,959 in Directors Compensation for the fiscal year ended December 31, 2023.

46.    During the Relevant Period, Defendant Machiels made the following sales of stock:

| Trade Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/17/2023 | 1,250 | $64.79 | $80,988 |
| 6/20/2023 | 1,250 | $88.41 | $110,513 |
| 5/17/2023 | 1,250 | $88.66 | $110,825 |
| 4/17/2023 | 1,250 | $81.05 | $101,313 |
| 3/17/2023 | 1,250 | $64.03 | $80,038 |
| 2/17/2023 | 1,250 | $52.38 | $65,475 |
| 1/17/2023 | 1,250 | $52.42 | $65,525 |
| 12/15/2022 | 1,250 | $52.35 | $65,438 |
| 11/15/2022 | 1,250 | $48.01 | $60,013 |
| 10/14/2022 | 1,250 | $59.31 | $74,138 |
| 9/15/2022 | 1,250 | $66.00 | $82,500 |
| 8/15/2022 | 1,250 | $67.21 | $84,013 |
| 7/15/2022 | 1,250 | $46.33 | $57,913 |
| 6/15/2022 | 1,250 | $39.29 | $49,113 |
| 5/16/2022 | 1,250 | $39.18 | $48,975 |
| 4/14/2022 | 1,250 | $50.90 | $63,625 |
| 3/15/2022 | 1,250 | $39.57 | $49,463 |
| 2/15/2022 | 1,250 | $45.43 | $56,788 |
| 1/14/2022 | 1,250 | $40.56 | $50,700 |
| 12/15/2021 | 3,000 | $42.88 | $128,640 |
| 11/4/2021 | 6,000 | $39.25 | $235,500 |
| 8/16/2021 | 2,500 | $56.95 | $142,375 |
| 7/15/2021 | 2,500 | $62.30 | $155,750 |
| 6/15/2021 | 2,500 | $64.83 | $162,075 |

| | | | |
|---|---|---|---|
| 5/14/2021 | 2,500 | $45.39 | $113,475 |
| 4/21/2021 | 2,500 | $45.76 | $114,400 |
| 3/15/2021 | 2,500 | $46.77 | $116,925 |
| 2/16/2021 | 2,500 | $46.00 | $115,000 |
| **Total Shares Sold** | 50,250 | **Total Proceeds** | $2,641,496 |

47.    Defendant Gerald Chan has served as a member of the board since 2013 and is currently the Chairman of the Board of Directors for the Company.

48.    The Apellis website states the following about Defendant Chan:

Gerald is a venture capitalist whose work focuses on startup biotechnology companies founded on novel science. He sits on the boards of several biotech companies, including Aduro Biotech, Syncrhoneuron, Matrivax, and Stealth Peptides. After completing his doctoral and post-doctoral training at Harvard University, he co-founded the Morningside Group, an investment firm with venture, private equity, and property investments that maintains a strong commitment to social responsibility. Gerald is a director of the Morningside Foundation, whose donations led to the founding of the Morningside College of the Chinese University of Hong Kong ad not the naming of the Harvard School of Public Health after his late father, T. H. Chan. Gerald remains closely associated with the School of Public Health, where he is an honorary fellowship at Wolfson College of Oxford University and an honorary Doctor of Social Science degree from the Chinese University of Hong Kong.

49.    According to the Company's 2024 Proxy Statement, Defendant Chan received $504,084 in Directors Compensation for the fiscal year ended December 31, 2023.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.    By reason of their positions as officers and/or directors of Apellis, and because of their ability to control the business and corporate affairs of Apellis, the Individual Defendants owed Apellis and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Apellis in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Apellis and its shareholders.

51.     Each director and officer of the Company owes to Apellis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Apellis, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Apellis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Apellis, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

55.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls,

earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

56.    To discharge their duties, the officers and directors of Apellis were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Apellis were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Massachusetts and the United States, and pursuant to Apellis's own Code of Conduct;

(b)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Remain informed as to how Apellis conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Apellis and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

14

(e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Apellis's operations would comply with all applicable laws and Apellis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to Apellis and the shareholders the duty of loyalty requiring that each favor Apellis's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Apellis and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, and directorial positions with Apellis, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Apellis.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.    In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

62.    The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

63.    The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

64.    To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Apellis, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

65.    Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or

should have been, aware of their overall role in furthering the misconduct.

66.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Apellis, and at all times operated within the course and scope of that agency.

## APELLIS' CODE OF CONDUCT

67.    The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Apellis's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

### WE CARE MESSAGE

As a global healthcare company, our business operations are highly regulated and subject to significant scrutiny.

It is important, that all Apellis employees understand and comply with the laws, rules, and regulations that apply to our function, subsidiary, and/or geographic region. Compliance both in letter and in spirit is the foundation upon which this Code is built and the driving force behind how Apellis conducts its business, but more importantly expresses our ethical commitment to patients and their families, health care providers and the community in which we live.

Apellis is committed to meeting or exceeding applicable regulatory authority requirements for current Good Manufacturing, Clinical, Laboratory and Pharmacovigilance Practices (GXPs). Employees who conduct or oversee cGXP-related activities on behalf of Apellis are expected to be familiar with and to comply with all applicable regulatory guidelines that apply to these operations.

All Apellis employees are required to adhere to company policies and procedures relevant to their business activities. While the Code is the foundation that sets forth the fundamental principles upon which our policies, procedures, and related guidance have been developed, each resource is a complement to the others, and each should be reviewed and understood.
Compliance with our Code is central to your responsibility as an Apellis employee. It is important that you take the time to carefully review our Code and gain a full appreciation of Apellis' expectation that you will observe the highest standard of ethical, moral, and professional conduct in all aspects of your activities. Failure to comply with the Code may result in disciplinary consequences, up to and including termination for cause.

While our Code and our policies and procedures set forth standards of conduct that apply to many commonly encountered situations, you are still expected to use your best judgment and to uphold our principles at all times. Please be aware that more detailed policies may be applicable to specific situations. If you have any questions about the appropriate course of action in any situation, please discuss your concerns with your management, HR, compliance or legal department.

By upholding the tenets of the Code every day, we can focus on the positive aspects of developing groundbreaking treatments for patients.

*    *    *

## LIFE AT APELLIS

Here at Apellis, we do things the right way. We stand for the utmost in quality of work, always, and we exercise care in every communication, every action we take.

This Code outlines the standards we hold at the forefront- and it's these standards which make us Apellis employees. While this Code sets forth the basics, there is no substitute for authentic dialogue at all levels of the organization- among peers, with supervisors and senior management, and if needed with HR, legal or ethics & compliance. All of us are invested in getting it right, and it's better to resolve issues through good communication through the organization.

*    *    *

## PRODUCT QUALITY & ADVERSE EVENTS

Product quality is at the heart of what we do, simply put.

We comply with all laws and regulations and have a robust process in place for handling any adverse events or quality complaints which arise from use of our products. If anything is brought to your attention, regarding either the product itself or an adverse effect that's been experienced by a user, you must report it within 24 hours.

Apellis is committed to maintaining an accurate risk-to-benefit profile for each Apellis product when used consistent with product labeling.

What is an Adverse Event ("AE")?

o    Adverse events are any untoward medical occurrence associated with the use of a drug or device, whether or not considered product-related.

What is a Serious Adverse Event ("SAE")?

o  An adverse event or suspected adverse reaction is considered "serious" if, in the view of either the investigator or sponsor, the events results in any of the following outcomes:
   - Death;
   - A life-threatening adverse event;
   - Inpatient hospitalization or prolongation of existing hospitalization;
   - A persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions; or
   - A congenital anomaly/birth defect.
   - 

*   *   *

## SCIENTIFIC INTEGRITY

Apellis is a patient-centric organization.

We have the highest respect for the patients who choose to participate in our clinical trials to help us deliver medicines of the highest quality to people who need them. We're committed to ensuring their safety, health and well-being, and to having the highest ethical, scientific and clinical standards in all of our research endeavors.

Apellis complies with all laws, regulations and cultures of the countries in which our studies are conducted relating to our clinical trials and our treatment of volunteers. We also ensure that we continue to meet global expectations on how we treat patients participating in our studies.

Apellis is committed to engaging in appropriate scientific exchange concerning research pipelines, marketed products, and relevant disease states.

*   *   *

## ETHICAL RESEARCH & RESEARCH TRANSPARENCY

When it comes to the research and development initiatives we undertake, ethics are at the forefront – period.

Our ethical, scientific and safety standards are of the highest measure, complying with all laws, guidelines and industry codes at all times

All proposals for clinical trials and research grants go through an extensive review, to make sure they meet both our explicit internal standards as well as external laws and regulations. We keep our research subjects safe as best we

19

can, and we obtain fully informed consent, always.

Apellis is also aware that in doing what we do, we shoulder a heavy moral responsibility when it comes to the humane treatment of animals. We're consistently prioritize advancing alternatives to animal research.

* * *

## FRAUD

Fraud. You won't be surprised to hear that it's strictly prohibited, at all levels, in any form.

Fraud is described as "a deliberate or deceptive act intended to result in financial or other gain".

Examples of fraud include:
- Dishonest acts;
- Embezzlement
- Forgery or alteration of negotiable instruments such as checks and drafts;
- Misappropriation of Apellis funds;
- Team member, customer, partner, or supplier assets;
- Unauthorized handling or reporting of Apellis' transactions, and
- Falsification of Apellis records or financial statements for any reason.

## DISCIPLINARY ACTIONS

If anyone is found to have violated an Apellis policy, our Code of Conduct, or the law- be they employee, contractor, or business partner – we will take appropriate corrective action. Employees who violate this code, company policy, or the law will be subject to disciplinary actions up to and including employee or contract termination. If a law or regulation has been broken, we'll cooperate fully with the authorities throughout.

## REPORTING SUSPECTED VIOLATIONS OF THE CODE

We recognize that issues are not always black and white.

Difficult situations can arise, and we want you to have the resources and guidance you need to navigate them with integrity and support. We mean it when we say that we have an "open door" policy; if you need guidance or have a concern, contact your manager, HR, Legal, Ethics & Compliance, or the Ethics & Compliance Hotline.

* * *

We each have a duty to report concerns of illegal or unethical conduct- it won't be stood for. Speak to your Manager and, if it's still weighing on your mind

after doing so,, take it up a notch and speak to someone else in management who you trust.

If you choose to report something to Apellis Ethics & Compliance Hotline instead, you're free to remain anonymous, where allowed, or identify yourself – that choice is yours. Either way, please provide as much information as possible so we can investigate fully, efficiently and effectively.

To that end: you will not be retaliated against for reporting in good faith a concern of potential illegal or unethical conduct. A concern could be regarding the laws we adhere to, the company policies we live by, or simply the Code of Conduct.

Unsure if there's been a violation? Bring it to our attention- you can speak to your manager, HR, Legal or Ethics & Compliance about your concerns, or you can use the anonymous hotline. We'll take everything that's brought to our attention seriously. Let us make that decision.

68.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

69.    In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## APELLIS' CORPORATE GOVERNANCE GUIDELINES

70.    Apellis's Corporate Governance Guidelines ("the Guidelines") emphasize the Board's responsibility to ensure transparency, integrity, and accountability in all communications and disclosures made by the company. According to the Guidelines, the Board is explicitly tasked with overseeing management's performance and ensuring that stockholders' interests are protected.

A.  Director Responsibilities

1. Oversee Management of the Company. The principal responsibility of the directors is to oversee the management of the Company and, in so doing, serve the best interests of the Company and its stockholders. This responsibility includes:

- Reviewing and approving fundamental operating, financial and other corporate plans, strategies and objectives.

- Evaluating the performance of the Company and its senior executives and taking appropriate action, including removal, when warranted

- Evaluating the Company's compensation programs on a regular basis and determining the compensation of its senior executives.

- Reviewing and approving senior executive succession plans.

- Evaluating whether corporate resources are used only for appropriate business purposes.

- Establishing a corporate environment that promotes timely and effective disclosure (including robust and appropriate controls, procedures and incentives), fiscal accountability, high ethical standards and compliance with all applicable laws and regulations.

- Reviewing the Company's policies and practices with respect to risk assessment and risk management.

- Reviewing and approving material transactions and commitments not entered into in the ordinary course of business.

- Developing a corporate governance structure that allows and encourages the Board to fulfill its responsibilities.

- Providing advice and assistance to the Company's senior executives.

- Evaluating the overall effectiveness of the Board and its committees.

**APELLIS' AUDIT COMMITTEE CHARTER**

71.    In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Machiels (Chair), Fonteyne, and Dunlop ("Audit Committee Defendants") owed specific additional duties to Apellis. Specifically, the Audit Committee Charter States:

## PURPOSE

The purpose of the Audit Committee of the Board of Directors (the "Board") of Apellis Pharmaceuticals, Inc. (the "Company") is to assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements.

\* \* \*

## C. AUTHORITY AND RESPONSIBILITIES

## GENERAL

The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the Company's registered public accounting firm (the "independent auditor"), in accordance with its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and, when required, the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's reports.

\* \* \*

## CONTROLS AND PROCEDURES

**Oversight.** The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act.

**Risk Management.** The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

**Procedures for Complaints.** The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

**Oversight of Related Person Transactions.** The Audit Committee shall review the Company's policies and procedures for reviewing and approving or ratifying "related person transactions" (defined as transactions required to be disclosed pursuant to Item 404 of Regulation S-K), including the Company's Related Person Transaction Policy, and recommend any changes to the Board. In accordance with the Company's Related Person Transaction Policy and NASAQ rules, the Audit Committee shall conduct appropriate review and oversight of all related person transactions for potential conflict of interest situations on an ongoing basis.

**Review and Approve Swaps.** The Audit Committee is authorized to review and approve the Company's entry into swaps, including transactions in swaps that are subject to mandatory clearing and to approve use of the end-user exception from clearing. The Audit Committee is also authorized to adopt and shall review annually thereafter a policy relating to the Company's use of the non-financial end-user exception, and shall report to the Board on the Company's compliance with and implementation of this policy on at least an annual basis. The Audit Committee may delegate responsibility for the implementation of the non-financial end-user policy to the Company's management, as the Audit Committee deems appropriate.

**Evaluation of Financial Management.** The Audit Committee shall coordinate with the Compensation Committee the evaluation of the Company's financial management personnel.

**Additional Duties.** The Audit Committee shall have such other duties as may be delegated from time to time by the Board.

<u>**PROCEDURES AND ADMINISTRATION**</u>

**Meetings.** The Audit Committee shall meet as often as it deems necessary in order to perform its responsibilities. The Audit Committee may also act by unanimous written consent in lieu of a meeting. The Audit Committee shall periodically meet separately with: (i) the independent auditor; (ii) Company management; and (iii) the Company's internal auditors. The Audit Committee shall keep such records of its meetings as it shall deem appropriate.

**Subcommittees.** The Audit Committee may form and delegate authority to one or more subcommittees, as it deems appropriate from time to time under the circumstances (including a subcommittee consisting of a single member). Any decision of a subcommittee to preapprove audit, review, attest or non-audit services shall be presented to the full Audit Committee at its next scheduled meeting.

**Reports to Board.** The Audit Committee shall report regularly to the Board.

**Charter.** At least annually, the Audit Committee shall review and reassess the adequacy of this Charter and recommend any proposed changes to the Board for approval.

**Independent Advisors.** The Audit Committee is authorized, without further action by the Board, to engage such independent legal, accounting and other advisors as it deems necessary or appropriate to carry out its responsibilities. Such independent advisors may be regular advisors to the Company. The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of such advisors as established by the Audit Committee.

**Investigations**. The Audit Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Audit Committee or any advisors engaged by the Audit Committee.

**Funding.** The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties.

**Periodic Self-Evaluation.** Periodically, the Audit Committee shall evaluate its own performance.

72.    Individual Defendants, because of their positions of control and authority as officers and/or directors of Apellis, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Apellis has needlessly expended and will continue to needlessly expend, significant sums of money.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**Background**

73.    Apellis is a commercial-stage biopharmaceutical company specializing in the discovery, development, and commercialization of therapeutic compounds that inhibit the complement system to treat autoimmune and inflammatory diseases, including geographic

atrophy. The company's common stock is traded on the Nasdaq under the ticker symbol "APLS."

74.    Geographic atrophy is an advanced stage of age-related macular degeneration, a disorder affecting the central retina. It is marked by the progressive death of retinal cells, eventually leading to blindness in individuals aged 60 and older.

75.    Geographic atrophy involves the overactivation of the complement system, a component of the immune system that aids antibodies and phagocytic cells in clearing pathogens from the body.

76.    Since at least 2015, Apellis's "lead product candidate" has been what is now marketed as SYFOVRE, a pegcetacoplan solution administered through an intravitreal injection-directly into the eye-to treat geographic atrophy.

77.    Pegcetacoplan is designed to offer comprehensive regulation of the complement system, a part of the body's immune response. By targeting complement proteins C3 and C3b, it aims to enhance cell survival and reduce vascular loss in the eye.

78.    SYFOVRE received FDA approval in February 2023 for treating geographic atrophy secondary to age-related macular degeneration (AMD) in the United States.

79.    SYFOVRE received FDA approval based on the results of two phase 3 studies, OAKS and DERBY. In these trials, Apellis claimed to evaluate the efficacy and safety of intravitreal pegcetacoplan compared to a sham treatment for geographic atrophy secondary to AMD.

80.    The OAKS and DERBY studies were two 24-month trial involving patients aged 60 and older with geographic atrophy secondary to AMD. The primary endpoint was the change in the total area of geographic atrophy lesions in the study eye from baseline to month 12. Key secondary endpoints, measured at 24 months, included changes in the monocular maximum

reading speed of the study eye, mean functional reading independence index score, normal luminance best-corrected visual acuity score, and mean threshold sensitivity of all points in the study eye by mesopic microperimetry (OAKS only). Safety analyses covered all patients who received at least one injection of pegcetacoplan or sham.

81.    Since SYFOVRE is administered via direct injection into the eye, safety issues were a major concern for investors, as any negative side effects could deter physicians from prescribing it and patients from using it. The most notable potential side effects impacting its marketability included: (i) inflammation, (ii) ischemic optic neuropathy, and (iii) retinal vasculitis.

82.    Retinal inflammation is a debilitating condition affecting the retina, characterized by excessive immune system activity within the eye. Its severity can vary from mild to moderate to severe. In cases of mild inflammation, symptoms may include slight cellular presence in typically cell-free areas (such as the anterior chamber or vitreous cavity) or mild vascular leakage, which can lead to cystoid macular edema (CME).

83.    More severe retinal inflammation often affects the retinal vessels and is referred to as vasculitis or described as having a vasculitis component. Vasculitis itself can range in severity from mild to severe, and even to occlusive. If left untreated, any form of retinal inflammation has the potential to progress, becoming more severe and involving the retinal vessels.

84.    Ischemic neuropathy is characterized by reduced blood flow (ischemia) specifically affecting the optic nerve head, the region where vessels enter the retina at the optic nerve.

85.    In ischemic vasculitis, the impairment extends more broadly, impacting the entire retinal vasculature.

86.    Retinal vasculitis may occur as an isolated condition or as a complication of local or systemic inflammatory disorders, involving inflammation of the retinal vessels. This sight-

threatening condition has the potential to lead to complete vision loss.

87.    Given its severity and potential impact on market acceptance of SYFOVRE, the presence of vasculitis in trial participants was a crucial factor for the market.

88.    The fluorescein angiogram is the most commonly used and accepted test to detect vasculitis in the eye, providing highly informative imaging for patients with retinal vasculitis. This technique, routinely employed in diagnosis, monitoring, and management, uses a fluorescent dye and a specialized camera. Angiographic signs, such as vascular leakage and macular edema, help assess disease activity. Dye leakage from the vascular compartment appears as perivascular hyperfluorescence.

89.    On a call with analysts on September 6, 2023, Defendant Francois emphasized the seriousness of vasculitis and acknowledged the critical role of fluorescein angiography in accurately diagnosing the condition.

> [W]hat is vasculitis? I mean vasculitis is inflammation of the blood vessels. And vasculitis on a systemic level that's typically associated with a pure autoimmune event against vessels. In the eye, what we're talking about is essentially a complication of inflammation.
>
> So severe inflammation then complicates into vasculitis, meaning when you put in fluorescein dye, it will leak from the blood vessels, right? That means the vessels are inflamed, probably as part of para-phenomenon of the overall inflammation. And then in very rare cases, that can be occlusive. That, whether you call it IOI, vasculitis occlusive that if you showed any retina doc, you will get differing opinions.

90.    Likewise, during a call with analysts on November 28, 2023, Defendant Francois admitted:

> [I]t's important to note here that vasculitis is really an image finding, right? I mean it refers to the leakage of blood from the blood vessels in the back of the eye, which can be associated with occlusion, but which is typically a manifestation of something else, either inflammation, sometimes autoimmune disease, whatever it is.

91.    Defendant Francois further acknowledged that, "vasculitis is something that can occur with intravitreal injections."

92.    Defendants were therefore fully aware that SYFOVRE carried a risk of vasculitis, given that it is an intravitreal therapy, and intraocular inflammation is a primary ocular adverse event linked to such treatments. Furthermore, having conducted clinical trials for pegcetacoplan for over a decade, Defendants were intimately familiar with the potential adverse event and risks associated with intravitreal therapies, reinforcing their understanding that retinal vasculitis was a risk associated with intravitreal injections including the method used to administer SYFOVRE.

93.    Additionally, retinal vasculitis was a significant concern for Defendants and investors ahead of the 2021 results of the OAKS and DERBY studies, as it had recently been linked to other intravitreal treatments for macular degeneration.

94.    Intravitreal administration of anti-vascular endothelial growth factor (anti-VEGF) agents is the primary treatment for various retinal diseases, including neovascular age-related macular degeneration. However, inflammatory adverse events, such as retinal vasculitis, have been associated with these medications.

95.    Defendant Francois was fully aware of this risk. He had publicly discussed Novartis' anti-VEGF treatment, Beovu (brolucizumab), which exhibited vasculitis side effects soon after its FDA approval and launch in 2020. Reports of vasculitis significantly impacted Beovu's adoption among physicians. Specifically, in October 2019, Novarti announced the FDA approval of Beovu or treating wet AMD. By February 2020, the ASRS reported cases of inflammation following Beovu treatment, including several instances of vasculitis. Novartis ultimately confirmed a safety signal indicating rare adverse events of "retinal vasculitis and/or retinal vascular occlusion that may result in severe vision loss." This was severely damaging to

the market for Beovu (as well as Novartis stock price). In response, Novartis was forced to update its label.

96.     During a call with analysts on November 1, 2023, Defendant Francois discussed Novartis' Beovu, stating:

> I mean the problem that we had is that a couple of years ago, there was another drug [Beovu] that started with this rate [of vasculitis] and ended up with a rate that was orders of magnitudes worse because there was a sensitization against the drug.

97.     Retinal vasculitis is also a known complication associated with other anti-VEGF treatments.

98.     As Defendant Francois explained during a November 28, 2023, call with analysts:

> [V]asculitis is not something that is – that doesn't happen in the absence of drugs being used or not, it happens with anti-VEGF injections.

99.     Over the 24-month period of the OAKS and DERBY trials, 419 participants were treated in the monthly dosing arm, while 420 were treated in the every-other-month (EOM) arm. During the trials, intraocular inflammation occurred in 3.8% of participants in the monthly arm and 2.1% in the EOM arm-10 to 20 times higher than in the sham arm. Among the 26 patients who experienced intraocular inflammation at 24 months, 17 (65%) reported the adverse events as mild, three (12%) as moderate, and six (23%) as severe.

100.    Plaintiffs consulted with Dr. Demetrios G. Vavvas, MD, PhD a highly esteemed expert in ophthalmology. Dr. Vavvas is the Solman and Libe Friedman Professor of Ophthalmology at Harvard Medical School and Co-Director of the Ocular Regenerative Medicine Institute. He also serves as the Director of the Retina Service at Massachusetts Eye and Ear. A full-time clinician scientist, Dr. Vavvas received his ophthalmology training through the Harvard Medical School Residency Program. After serving as Chief Resident and Director of the Eye

Trauma Service at Mass Eye and Ear, he completed a fellowship in Vitreoretinal Surgery, where he earned the Fellow of the Year award for excellence in teaching and served as Chief Fellow. Dr. Vavvas is an active member of the retina faculty, managing a wide range of surgical and medical vitreoretinal diseases. His clinical focus includes macular degeneration, diabetic retinopathy, trauma, and oncology. Notably, he was the first to describe the use of small-gauge vitrectomy for cataract surgery complications and trauma and developed a modified approach to the scleral buckle technique, making it more predictable and teachable. Alongside Drs. Dean Eliott and John B. Miller, he co-directs the Annual Fellows Course, which trains first-year vitreoretinal fellows from over 20 programs nationwide. Dr. Vavvas closely monitored the clinical trials and results of pegcetacoplan/SYFOVRE as they were reported. He attended multiple conferences discussing these results, delivered presentations, and authored publications examining the risks and benefits of this treatment.

101. According to Dr. Vavvas, "[i]t is likely that the use of flueorescein angiogram during the clinical trial, coupled with the fact that vasculitis was 10-20x times the sham, dose dependent, and one quarter of it rated as severe, would have disclosed the risk of vasculitis and would have given us better estimation of the risk of mild, moderate or severe vasculitis."

102. Ischemic optic neuropathy was reported in 1.7% of participants in the monthly treatment arm and 0.2% in the every-other-month (EOM) arm, with no cases observed in participant assigned to the sham arm. According to Dr. Vavvas, the cases of ischemic optic neuropathy and disc edema (papilledema) should have been reported collectively and subjected to further analysis. "This could easily be another form of the rarer but devastating ischemic retina vasculitis…If these cases were investigated further, or more information disclosed to the community, the community would have had a better understanding of the real risk of more

generalized retinal ischemia."

103.    The prompt use of fluorescein angiography could have identified which of these numerous cases of inflammation and ischemic optic neuropathy were associated with vasculitis.

104.    Critically, however, ***there was no defined protocol in either the OAKS or DERBY studies to promptly obtain angiography in cases of intraocular inflammation or ischemic optic neuropathy.***

105.    Notably, the Company acknowledged in a March 16, 2022, press release, "Rates of endophthalmistis and intraocular inflammation continue to be generally in line with those reported in studies of other intravitreal therapies." Despite the rates of inflammation being "in line" with other intravitreal therapies, which are known to carry a risk of vasculitis, Apellis lacked a defined protocol for promptly obtaining angiography in cases of intraocular inflammation or ischemic optic neuropathy. Instead, angiography was conducted only at the conclusion of the study-either when the study reached its endpoint or when a participant dropped out. In the latter case, angiography was delayed by at least 30 days. This substantial delay reduced the sensitivity of detecting issues that may have already been treated or resolved over time.

106.    Therefore, considering the established risk of vasculitis with other intravitreal therapies and Defendant Francois' admission that angiography was crucial for accurate diagnosis, Defendants either knew or acted with reckless disregard by failing to promptly use angiography before publicly asserting that no trial participants had vasculitis.

107.    Defendants were aware of the risk of vasculitis but deliberately opted not to implement a defined protocol for accurately detecting it using fluorescein angiography.

108.    Due to the disproportionate dropout rates in treatment observed across the studies, it was materially false and misleading for the Defendants to assert that there were no cases of

retinal vasculitis, particularly without a defined protocol to promptly perform angiography in cases of intraocular inflammation nor ischemic optic neuropathy.

109.    When reporting the results of the OAKS and DERBY studies, Apellis presented estimated data derived from a statistical MMRM (Mixed Models for Repeated Measures (MMRM) analysis rather than the actual data. Using this model, Apellis claimed a 22% reduction in total lesion size, whereas the actual reduction was only 7.4%.

110.    This reporting was materially false and misleading because the Company failed to disclose details on all relevant functional metrics. As shown in the following tables, all functional metrics worsened with the treatment, indicating significant risks. Therefore, additional disclosures highlighting the decline in all measured functions were necessary to inform doctors and investors of potential hidden risks that could threaten patients' vision and to ensure the Defendants' statements were not materially misleading.

| Summary of Functional Outcomes Compared to Sham | Monthly | EOM |
|---|---|---|
| Vision | -13.7% | -27.2 |
| Max Reading Speed | -17.6% | -11.6% |
| Fx Reading Independence Score | -9.4% | -15.6% |
| NEI VFX-25 | -10.6% | -1.7% |
| Mac Sensitivity | -12.5% | -3.7% |

|  | Pegcetacoplan monthly | Pegcetacoplan every other month | Sham |
|---|---|---|---|
| **Monocular maximum reading speed** | | | |
| Patients included in the model* | 347/403 (86%) | 344/406 (85%) | 345/402 (86%) |
| Least-squares mean change (SE), words per min† | −22·49 (2·57) | −21·35 (2·16) | −19·13 (2·40) |
| Difference (95% CI) in least-squares mean pegcetacoplan vs sham, words per min | −3·36 (−9·89 to 3·17) | −2·23 (−8·20 to 3·75) | NA |
| p value pegcetacoplan vs sham | 0·31 | 0·47 | NA |
| **Functional reading independence index score** | | | |
| Patients included in the model‡ | 371/403 (92%) | 376/406 (93%) | 373/402 (93%) |
| Least-squares mean change (SE), score | −0·35 (0·04) | −0·37 (0·04) | −0·32 (0·04) |
| Difference (95% CI) in least-squares mean pegcetacoplan vs sham, score | −0·03 (−0·14 to 0·08) | −0·06 (−0·16 to 0·05) | NA |
| p value pegcetacoplan vs sham | 0·58 | 0·30 | NA |
| **Normal-luminance best-corrected visual acuity score** | | | |
| Patients included in the model§ | 403/403 (100%) | 406/406 (100%) | 402/402 (100%) |
| Least-squares mean change (SE), ETDRS letters | −7·89 (0·74) | −8·83 (0·74) | −6·94 (0·74) |
| Difference (95% CI) in least-squares mean pegcetacoplan vs sham, ETDRS letters | −0·95 (−2·97 to 1·07) | −1·89 (−3·93 to 0·15) | NA |
| p value pegcetacoplan vs sham | 0·36 | 0·069 | NA |
| **National Eye Institute Visual Functioning Questionnaire 25 distance activity subscale score** | | | |
| Patients included in the model¶ | 375/403 (93%) | 380/406 (94%) | 377/402 (94%) |
| Least-squares mean change (SE), score | −10·98 (1·35) | −10·10 (1·26) | −9·93 (1·19) |
| Difference (95% CI) in least-squares mean pegcetacoplan vs sham, score | −1·05 (−4·35 to 2·25) | −0·17 (−3·35 to 3·00) | NA |
| p value pegcetacoplan vs sham | 0·53 | 0·92 | NA |
| **Mean threshold macular sensitivity** | | | |
| Patients included in the model‖ | 179/202 (89%) | 187/205 (91%) | 186/207 (90%) |
| Least-squares mean change (SE), decibel | −3·32 (0·30) | −3·06 (0·23) | −2·95 (0·22) |
| Difference (95% CI) in least-squares mean pegcetacoplan vs sham, decibel | −0·37 (−1·06 to 0·33) | −0·11 (−0·69 to 0·47) | NA |
| p value pegcetacoplan vs sham | 0·30 | 0·71 | NA |

Data are n/N (%), unless otherwise stated. Secondary endpoints were analysed in OAKS and DERBY combined, except for the macular sensitivity measurement, which was only evaluated in OAKS. ETDRS=Early Treatment Diabetic Retinopathy Study. NA=not applicable. *Detailed information of the model is given in appendix 1 (p 11). †Maximum reading speed was calculated as the mean of the three highest non-zero reading speeds (or two, or one value, as available), except when all three reading speed values were 0, in which case the maximum reading speed was set at 0. ‡Detailed information of the model is given in appendix 1 (p 11). §Detailed information of the model is given in appendix 1 (p 11). ¶Detailed information of the model is given in appendix 1 (p 11). ‖Detailed information of the model is given in appendix 1 (p 11).

*Table 3:* Visual function endpoint results from baseline to month 24

111.     The Defendants' statistical model operated on the flawed assumption that missing

34

data was random, leading to a misleading reduction rate (garbage in-garbage out). In reality, data was missing due to significantly different dropout rates between the treatment arm (~30%) and the sham arm (~20%). Despite repeated requests from medical professionals, academics, and others, Defendants failed to provide the necessary baseline data for individuals lost to follow-up, who discontinued treatment, or who converted to wet AMD. By omitting this critical data in discussions of the test results, Defendants were able to conceal their deception.

112.    The studies significantly overestimated the treatment effects for several reasons.

a.    First, one in three patients discontinued treatment before the study concluded. The higher dropout rate in the treatment arm compared to the sham arm introduced improper bias into the treatment results. Dropouts are typically more common among patients who experience no benefit or suffer side effects from the treatment, leaving a biased sample in the treatment arm consisting of individuals who responded better to the drug than those in the sham group.

b.    Second, three times as many patients in the treatment arm converted to exudative AMD, a significant factor because exudative AMD can artificially reduce dark areas in autofluorescence imaging, potentially leading to a misinterpretation of patient improvement. The higher incidence of wet AMD in the treatment arm falsely "reduced" the area of lesions in the treatment group compared to the control group; however, this reduction does not reflect an actual improvement for the patients.

113.    According to Dr. Vavvas, the high dropout rates- nearly one in three patients in one study and almost one in five in the other- significantly impact the accurate assessment of both the treatment's efficacy and its safety and risks. The Defendants failed to disclose critical information about the dropouts necessary to make their statements not materially misleading. For instance, they did not provide baseline risk characteristics of the dropouts, which were essential for accurately

assessing efficacy. More critically, Defendants omitted detailed information about the dropouts' vision, complaints, and clinical exam findings both immediately prior to and following their last dose, which is crucial for evaluating safety and risk.

114.    Dr. Vavvas further noted that while Apellis claimed it would conduct an angiogram at the end of the study or following early termination, the protocol mandated a minimum 30-day waiting period before performing the angiogram. This delay significantly hindered the ability to detect the underlying issues that prompted early termination, as those issues may have been treated or resolved during the elapsed time.

115.    According to Dr. Vavvas, the instances of inflammation, ischemic optic neuropathy, high dropout rates, and the Company's failure to implement a defined protocol in the OAKS or DERBY studies for promptly performing angiography in cases of intraocular inflammation or ischemic optic neuropathy indicate that "management, the CEO, and the Company had to have known there was a real risk of vasculitis, which should have been disclosed." At a minimum, the Defendants recklessly disregarded this risk.

116.    On January 28, 2021, the Defendant hosted Apellis's Virtual Investor Event, during which the Company delivered an online presentation titled, "Pegcetacoplan: Advancing the First Potential Treatment for Geographic Atrophy (GA)." In the presentation, Apellis highlighted the efficacy of pegcetacoplan for patients with GA, stating that the concluded Phase 2 FILLY study met [its] primary endpoint, reducing GA lesion growth. Additionally, when discussing the expectations for the Phase 3 DERBY and OAKS trials, the Company claimed these trials would build upon the robust results of the FILLY trial, with "[t]op-line results expected Q3 2021."

117.    On September 9, 2021, the Company released top-line data from the DERBY and OAKS trials for the 12-month period. Among other statements, Apellis claimed that

"[p]egcetacoplan was well tolerated in both Phase 3 studies." Importantly, the Company also reported that "[n]o events of retinal vasculitis or retinal vein occlusion were observed" and that "[t]here were no clinically relevant changes in vision for patients who developed infectious endophthalmitis or intraocular inflammation…."

118.    On October 11, 2021, Apellis released a presentation titled, "Safety of intravitreal pegcetacoplan in geographic atrophy: results from the DERBY and OAKS trials." In this presentation, Apellis stated that there "were no cases of vasculitis or occlusive vasculitis" reported to date in the OAKS and DERBY trials.

119.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis, (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

120.    On November 8, 2021, Apellis addressed the results of the DERBY and OAKS

trials in its Form 10-Q quarterly report for the period ending September 30, 2021. Among other statements, Apellis reiterated that "[n]o vents of retinal vasculitis or retinal vein occlusion were observed" to date in the DERBY and OAKS trials The Company also claimed that "[t]here were no clinically relevant changes in vision for patients who developed infectious endophthalmitis or intraocular inflammation.

121.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

122.    On November 12, 2021, Apellis released a presentation titled "Treatment of Geographic Atrophy Secondary to Age-Related Macular Degeneration With Pegcetacoplan: Updates on the Randomized Phase 3 DERBY and OAKS Trials." In this presentation, the Company once again emphasized the safety of SYFOVRE, stating that "[t]here were no cases of

vasculitis or occlusive vasculitis."

123.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

124.    On February 28, 2022, Apellis filed its annual report for the fiscal year ending December 31, 2021, on Form 10-K. In the report, the Company reiterated that "[n]o events of retinal vasculitis or retinal vein occlusion were observed" in the DERBY and OAKS trials. Apellis also stated that "[t]here were no clinically relevant changes in vision for patients who developed infectious endophthalmitis or intraocular inflammation."

125.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the

rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

126.    On March 16, 2022, the Company announced longer-term data from its Phase 3 DERBY and OAKS trials, highlighting that "intravitreal pegcetacoplan continued to reduce geographic atrophy, or GA, lesion growth and demonstrated a favorable safety profile at month 18 for the treatment of GA secondary to age-related macular degeneration, or AMD". The Company also reassured investors, stating that "[n]o events of retinal vasculitis or retinal vein occlusion were observed"

127.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer

SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

128.    On May 2, 2022, Apellis released a presentation titled "Efficacy of intravitreal pegcetacoplan in patients with geographic atrophy (GA): 18-month results from the phase 3 OAKS and DERBY studies." In this presentation, Apellis reiterated that "no cases of retinitis or vasculitis (occlusive or nonocclusive) were reported."

129.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography

was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

130.    On July 14, 2022, Apellis released a follow-up presentation titled "Safety of Intravitreal Pegcetacoplan for Geographic Atrophy (GA): 18-Month Results from the DERBY and OAKS trials." In the presentation Apellis stated that "[p]egcetacoplan was well tolerated through Month 18" of the studies. The Company also reported that, among the instances of intraocular inflammation, there were "[n]o reports of retinitis or vasculitis (occlusive or non-occlusive)."

131.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

132.    On August 8, 2022, Apellis filed its Form 10-Q quarterly report for the quarter

ended June 30, 2022. In the report, the Company reiterated that, "[a]t month 18, pegcetacoplan continued to demonstrate a favorable safety profile, consistent with safety at 12 months and longer-term exposure to intravitreal injections." Notably, Apellis also represented that "[n]o events of retinal vasculitis or retinal vein occlusion were observed."

133.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

134.    On August 24, 2022, Apellis announced top-line data from the DERBY and OAKS trials after 24 months. The Company stated that "[p]egcetacoplan continued to demonstrate a favorable safety profile, consistent with safety data to date and longer-term exposure to intravitreal injections." Additionally, Apellis reported that "[n]o events of occlusive vasculitis or retinitis were observed over 24 months."

135.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

136.    During a conference call on August 24, 2022, discussing the 24-month results of the Phase 3 DERBY and OAKS trials, Defendant Francois emphasized that the results continued to demonstrate "a favorable safety profile in line with what we saw at 12 and 18 months."

137.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer

SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

138.    On November 3, 2022, Apellis released an updated presentation titled, "Safety of Intravitreal Pegcetacoplan in Geographic Atrophy: 24-Month results from the OAKS and DERBY phase 3 trials." In the presentation, the Company once again stated that there were "[n]o reports of occlusive or nonocclusive retinitis or vasculitis."

139.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography

was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

140.    At the "5th Annual Evercore ISI HealthCONx Conference 2022" on November 29, 2022, in response to a participant's question confirming that, "to date, no vasculitis or retinitis" had been observed, Defendant Francois confirmed, "[t]hat is correct."

141.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

142.    On February 17, 2023, Apellis issued a press release announcing the FDA approval of pegcetacoplan injections for the treatment of GA under the brand name SYFOVRE. The press release included the following "WARNINGS AND PRECAUTIONS," related to SYFOVRE: (1)

"Endophthalmitis and Retinal Detachments," (2) "Neovascular AMD," (3) "Intraocular inflammation," and (4) "Increased Intraocular Pressure." Notably the warning failed to include the risk of vasculitis, a significant omission given its potential association with SYFOVRE use.

143.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

144.    On February 17, 2023, Apellis held a conference call to discuss the FDA approval of pegcetacoplan injections for the treatment of GA under the name SYFOVRE. During the presentation accompanying the call, the Company promoted SYFOVRE as "[t]he first and only FDA-approved treatment for geographic atrophy secondary to age-related macular degeneration." Apellis also claimed that SYFOVRE demonstrated a "[w]ell-demonstrated safety profile" after approximately 12,000 injections over a 24-month period. Furthermore, the Company reiterated

that "[n]o events of occlusive or non-occlusive vasculitis or retinitis were observed" during the DERBY and OAKS trials.

145.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

146.    On February 21, 2023, Apellis filed its annual report for the fiscal year ending December 31, 2022, on Form 10-K. In the report, the Company reiterated that "SYFOVRE was well-tolerated in both DERBY and OAKS" and that "[n]o events of occlusive or non-occlusive vasculitis or retinitis occlusion were observed over 24 months" in the DERBY and OAKS trials.

147.    The statements referenced above were materially false and misleading because the Defendants misrepresented and failed to disclose the true risk that SYFOVRE use was associated with retinal vasculitis. The Individual Defendants knew, or recklessly disregarded, that: (i) the

rates of inflammation and neuropathy (potential symptoms of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

148.    After over two years of repeated assurances from Defendants-on more than a dozen occasions-that no cases of vasculitis or retinitis had been reported, the market began to uncover the truth. On Saturday, July 15, 2023, the American Society of Retina Specialists Research and Safety in Therapeutics ("ASRS ReST") Committee issued a notice reporting cases of retinal vasculitis in patients treated with SYFOVRE. Specifically, the ASRS ReST Committee revealed that ophthalmologists had identified six instances of retinal vasculitis following SYFOVRE treatments.

149.    Following this news, the price of Apellis common stock plummeted by $32.04 per share, representing a decline of approximately 38%. The stock dropped from a closing price of $84.50 per share on Friday, July 14, 2023, to close at $52.46 per share on Monday, July 17, 2023.

150.    After the market closed on July 17, 2023, Apellis issued a statement addressing the concerns raised by the ASRS regarding vasculitis associated with SYFOVRE. The Company

explained the following:

> All events were observed after the first injection of SYFOVRE, between 7-13 days after drug administration, and with no specific lots implicated. Upon review with external experts, two of the events were confirmed as occlusive, one was confirmed as non-occlusive, and the remaining three were undetermined based on limited information and lack of imaging, The etiology of these events is unclear, and outcomes in these patients are still evolving.

> \* \* \*

> The Company is continuing to conduct a thorough investigation of each of the events, working closely with the ReST Committee and several external specialists. Apellis takes adverse event reporting very seriously and immediately followed up with the FDA upon receiving reports of vasculitis. In this regard, each event was reviewed with the FDA and no action is planned at this time. The Company has updated ReST on these interactions and will continue to do so should new information become available.

151.    Following this news, the price of Apellis common stock dropped by $12.46 per share, representing a decline of 23.75%. The stock fell from a closing price of $52.46 per share on July 17, 2023, to close at $40.00 per share on July 18, 2023.

152.    Before the market opened on July 20,2023, Wedbush significantly downgraded Apellis's price target by over 50%, reducing it from $86.00 per share to $40.00 per share, in light of the recently disclosed vasculitis risks associated with SYFOVRE.

153.    Following this news, the price of Apellis common stock fell by $6.25 per share, representing a decline of approximately 15%. The stock dropped from a closing price of $4049 per share on July 19, 2023, to close at $34.24 per share on July 2023.

154.    On July 29, 2023, Apellis issued a press release updating its review of the six retinal vasculitis events reported by the ASRS in connection with SYFOVRE treatments. In the update, Apellis confirmed a seventh case of retinal vasculitis, as determined by its internal safety committee and external retina/uveitis specialists. The Company also disclosed that it was evaluating an eighth reported case of retinal vasculitis, which had not yet been confirmed.

155.    Following this news, the price of Apellis common stock dropped by $6.27 per share, representing a decline of approximately 19.6%. The stock fell from a closing price of $32.02 per share on July 28, 2023, to close at $25.75 per share on July 31, 2023.

156.    In November 2023, the prescribing information for SYFOVRE was updated to include "Retinal Vasculitis and/or Retinal Vascular Occlusion" under the "Warnings and Precautions" section, reflecting the acknowledgement of these risks.

157.    On December 21, 2023, the ASRS ReST Committee published a further review of the cases of vasculitis associated with SYFOVRE. The review noted that "[t]here were no reported cases of retinal vasculitis or occlusive retinal vasculopathy in the clinical trials." However, the Committee emphasized that "there was no defined protocol in these studies to obtain angiography in cases of intraocular inflammation," which may have limited the ability to identify such events during the trials.

158.    On April 22, 2021, Apellis filed its 2021 proxy statement ("2021 Proxy") with the SEC, wherein Defendants solicited shareholder votes in favor of three proposals, including the re-election of certain Individual Defendants.

159.    On April 20, 2022, Apellis filed its 2022 proxy statement ("2022 Proxy") with the SEC, wherein Defendants solicited shareholder votes in favor of three proposals, including the re-election of certain Individual Defendants.

160.    On April 21, 2023, NextEra filed its 2023 proxy statement ("2023 Proxy" and with the 2021 Proxy and 2022 Proxy, the "Proxy Statements") with the SEC, wherein Defendants solicited shareholder votes in favor of three proposals, including the re-election of certain Individual Defendants.

125.    The Proxy Statements stated that Apellis had adopted a Code of Business Conduct

& Ethics applicable to all representatives of Apellis, including directors.

126.    The Proxy Statements note that the Audit Committee oversees compliance with legal and regulatory requirements as well as monitoring internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics.

161.    The Proxy Statements state that:

> Our board of directors oversees our risk management processes directly and through its committees. Our management is responsible for risk management on a day-to-day basis and our board and its committees oversee the risk management activities of management. Our board of directors satisfies this responsibility through full reports by each committee chair regarding the committee's considerations and actions, as well as through regular reports directly from officers responsible for oversight of particular risks within our company. Our audit committee oversees risk management activities related to financial controls and legal and compliance risks. Our compensation committee oversees risk management activities relating to our compensation policies and practices. Our nominating and corporate governance committee oversees risk management activities relating to board composition and management succession planning. In addition, members of our senior management team attend our quarterly board meetings and are available to address any questions or concerns raised by the board on risk management and any other matters. Our board of directors believes that full and open communication between management and the board of directors is essential for effective risk management and oversight.

162.    The Proxy Statements each asked shareholders to ratify the compensation paid to the Company's named executive officers.  In connection with these awards, the Proxy Statements state that the Company's "named executive officers are rewarded for the achievement of our near-term and longer-term financial and strategic goals and for driving corporate financial performance and stability."

163.    The Proxy Statements, however, failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to product oversight, financial reporting, and

legal compliance.

164.    The Proxy Statements were also false and misleading in that they failed to disclose that: (1) contrary to their descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate the law, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

165.    The false and misleading elements of the Proxy Statements were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors and the approval of executive compensation.

166.    The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures or allowed the illicit activity described in this Complaint.

167.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

168.    The Individual Defendants breached their fiduciary duties to Apellis because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (i) the rates of inflammation and neuropathy (potential symptoms

of retinal vasculitis) observed in the OAKS and DERBY trials were comparable to other intravitreal injection treatments where retinal vasculitis had been identified, (ii) Intravitreal injection including those used to administer SYFOVRE, inherently carry a risk of causing retinal vasculitis., (iii) there had been recent, high-profile incidents of intravitreal injections causing retinal vasculitis, underscoring the known risks, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial. Furthermore, while the Defendants acknowledged that angiography was the appropriate method for detecting retinal vasculitis, they failed to establish a defined protocol for promptly conducting angiography in cases of intraocular inflammation or ischemic optic neuropathy, thus neglecting a critical safeguard to detect and address this risk.

## INSIDER SELLING

169.     Before the full disclosure by Apellis and understanding by the market of the truth concerning SYFOVRE Defendants Francois, Dunlop, and Machiels ("Insider Trading Defendants") sold nearly four-hundred-thousand shares while in possession of material non-public information regarding the Company's business.

170.     Defendant Francois sold 118,200 Apellis shares, while the price of the Company's stock was artificially inflated for approximately $8,380,935 in proceeds while in possession of material, non-public information. As the Company's CEO, Defendant Francois knew the truth about (i) the rates of inflammation and neuropathy observed in the OAKS and DERBY trials, (ii) the risk of retinal vasculitis associated with intravitreal injection including those used to administer SYFOVRE, (iii) the high-profile incidents of intravitreal injections causing retinal vasculitis, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested

the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial.

171.    Defendant Dunlop sold 227,214 Apellis shares, while the price of the Company's stock was artificially inflated for approximately $11,808,977 in proceeds while in possession of material, non-public information. As a director, Defendant Francois knew the truth about (i) the rates of inflammation and neuropathy observed in the OAKS and DERBY trials, (ii) the risk of retinal vasculitis associated with intravitreal injection including those used to administer SYFOVRE, (iii) the high-profile incidents of intravitreal injections causing retinal vasculitis, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial.

172.    Defendant Machiels sold 50,250 Apellis shares, while the price of the Company's stock was artificially inflated for approximately $2,641,496 in proceeds while in possession of material, non-public information. As a director, Defendant Francois knew the truth about (i) the rates of inflammation and neuropathy observed in the OAKS and DERBY trials, (ii) the risk of retinal vasculitis associated with intravitreal injection including those used to administer SYFOVRE, (iii) the high-profile incidents of intravitreal injections causing retinal vasculitis, (iv) the significantly higher dropout rates in the treatment arms compared to the sham arm suggested the possibility that side effects, such as retinal vasculitis, could have contributed to participants leaving the trial.

## HARM TO THE COMPANY

173.    As a direct and proximate result of the Individual Defendants' misconduct, Apellis has incurred, and will continue to incur, losses and expenses amounting to millions of

dollars.

174.    Such expenditures include but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and Chief Scientific Officer any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

176.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

177.    As a direct and proximate result of the Individual Defendants' actions, Apellis has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

178.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

179.    Apellis is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

180.    Plaintiff is a current shareholder of Apellis and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.

181.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

182.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

183.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

184.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

185.    The Company's Board is currently comprised of six members: Defendants Francois, Fonteyne, O'Brien, Dunlop, Machiels, and Chan (the "Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Defendants, *i.e.*, 3, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

186.    The Director Defendants either knew or should have known of the false and materially misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

187.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

188.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

189.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members, the Director Defendants knew, or should have known, the material facts surrounding SYFOVRE.

190.    The Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

**<u>Defendant Francois</u>**

191.    Defendant Francois is not disinterested or independent, and therefore is incapable of considering demand, because Francois is, and was at all relevant times, an employee (CEO since the Company's inception in 2009 and a board member) who derived substantially all of his wealth and livelihood from his relationship with the Company making him not disinterested or independent.

192.    The lack of independence and financial benefits received by Francois renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

193.    Defendant Francois, while in possession of material non-public information, sold 118,200 shares of the Company's stock at various prices per share for a windfall of $8.38 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements. As a result of his insider selling, Defendant Francois may be personally subject to disgorgement.

194.    In addition, Francois is a defendant in the Securities Class Action, which seeks to hold hi liable for much of the same wrongdoing as is alleged herein.

195.    Furthermore, the Company's 2024 Proxy concedes that Francois is not an independent director.

196.    As such, Defendant Francois cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Machiels, Fonteyne, and Dunlop**

197.    Defendants Machiels (Chair), Fonteyne, and Dunlop are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements in violation of the Audit Committee Charter. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless regard these Defendants caused these improper statements.

198.    Defendant Machiels, while in possession of material non-public information, sold 50,250 shares of the Company's stock at various prices per share for a windfall of $2.64 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements. As a result of his insider selling, Defendant Machiels may be personally subject to disgorgement.

199.    Defendant Dunlop, while in possession of material non-public information, sold 227,214 shares of the Company's stock at various prices per share for a windfall of $11.8 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements. As a result of his insider selling, Defendant Dunlop may be personally subject to disgorgement.

200.    For these reasons, Machiels, Fonteyne, and Dunlop breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and therefore excused.

**Additional Reasons Demand Is Futile**

201.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Apellis's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

202.    Furthermore, demand, in this case, is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. The Director Defendants have longstanding business and personal relationships with each

other and with other Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.

203. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

204. Apellis has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who are responsible for that wrongful conduct to attempt to recover for Apellis any part of the damages Apellis suffered and will continue to suffer, thereby. Thus any demand to the Directors would be futile.

205. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent that such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

206. The acts complained of herein constitute violations of fiduciary duties owed by Apellis's officers and directors, and these acts are incapable of ratification.

207. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e.,

monies belonging to the stockholders of Apellis. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Apellis, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

208.    If there is no directors' and officers' liability insurance, then the Directors will not cause Apellis to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability, Accordingly, demand is futile in that event, as well.

209.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused and futile.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of Section 14(a) of the Exchange Act
### Against the Director Defendants

210.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

211.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

212.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

213.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in the Proxy Statements.  Specifically, the Proxy Statements contained false statements and failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to product oversight, financial reporting, and legal compliance.

214.    The Proxy Statements were also false and misleading in that they failed to disclose that: (1) contrary to their descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate the law, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

215.    The false and misleading elements of the Proxy Statements were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors and the approval of executive compensation.

216. The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxy were materially false and misleading.

217. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy.

218. Plaintiff has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Breach of Fiduciary Duty**

219. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

220. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

221. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

222. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent

business judgment to protect and promote the Company's corporate interests.

223.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

224.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Insider Trading Defendants for Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information

225.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226.     At the time that the Insider Trading Defendants sold their Apellis stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

227.     The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Apellis stock.

228.     The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and

good faith.

229.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, any profits made by the Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

230.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

231.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Apellis.

232.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Apellis that was tied to the performance or artificially inflated valuation of Apellis, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

233.    Plaintiff, as a shareholder and a representative of Apellis, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

234.    Plaintiff on behalf of Apellis has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

237.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring millions of dollars of legal liability and/or legal costs, including the judgment in the Securities Class Action.

238.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

239.    Plaintiff on behalf Apellis has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

sale proceeds, and imposing a constructive trust thereon;

      C.     Awarding punitive damages;

      D.     Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

      Plaintiff hereby demands a trial by jury.

Dated: December 19, 2024

                      **MATORIN LAW OFFICE, LLC**

                      By: */s/ Mitchell J. Matorin*
                      Mitchell J. Matorin (BBO #649304)
                      18 Grove Street, Suite 5
                      Wellesley, MA 02482
                      (781) 453-0100
                      mmatorin@matorinlawoffice.com

                      **KUEHN LAW, PLLC**
                      Justin A. Kuehn
                      53 Hill Street, Suite 605
                      Southampton, NY 11968
                      Phone: (833) 672-0814
                      justin@kuehn.law

                      *Counsel for Plaintiff*